IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>ERIC KAMAHELE, et al.,<br><br>        Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:08-cr-758 |

        Defendants have challenged the admissibility of the testimony of Officer Break Merino, an eleven-year veteran with law enforcement with six-and-a-half years in the gang investigative unit of the Salt Lake City Police Department. The Government gave notice that it intended to call Officer Merino as an expert witness in the upcoming criminal trial. The court held a hearing on May 6, 2011, and July 13, 2011, to determine whether Officer Merino qualifies as an expert under Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).[1] Having considered the record established in pleadings and at the hearings, as well as pertinent law, the court holds that: (1) Officer Merino is qualified to testify as

---

[1]The Defendants contended that the United States' disclosure of Officer Merino's qualifications and his opinions was insufficient to allow them to effectively question Officer Merino. The court instructed all parties that Officer Merinos's testimony at the first hearing would serve as a supplement to the initial disclosure. (Hr'g Tr., May 6, 2011 (May 6 Tr.) at 6-7.) The Defendants were allowed to file written memoranda challenging Officer Merino's testimony, and at the July 13 hearing, the Defendants had the opportunity to cross-examine Officer Merino. Following the second hearing, the court instructed the parties to file supplemental memoranda.

an expert on <u>general</u> subjects covering the background, structure and organization of the Tongan Crip Gang (TCG), that is, 1(A) through 1(N) of the United States' Supplemental Notice (Dkt. No. 517), and (2) if during trial a Defendant believes that Officer Merino's testimony is exceeding the boundaries that this order sets, the Defendant may object. Accordingly, the court DENIES IN PART the Defendants' Motions in Limine to Exclude the Testimony of Officer Merino (Dkt. Nos. 362, 540, 544, 757) and TAKES UNDER ADVISEMENT until after the September 9, 2011, hearing whether Officer Merino may offer expert testimony on whether the individual Defendants are members or associates of TCG.

## ANALYSIS

### Standards Governing Admissibility of Expert Witness Testimony and Reports

Under the Federal Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a <u>witness qualified as an expert by knowledge, skill, experience, training, or education</u>, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is <u>based upon sufficient facts or data</u>, (2) the testimony is the <u>product of reliable principles and methods</u>, and (3) the witness has <u>applied the principles and methods reliably to the facts of the case</u>." Fed. R. Evid. 702 (emphasis added).

Under the evidentiary rule, the court's inquiry is twofold. First, the court must determine whether the witness is qualified as an expert in the area about which he will testify. <u>United States v. Nacchio</u>, 555 F.3d 1234, 1241 (10th Cir. 2009) ("In determining whether expert testimony is admissible, the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." (quoting

2

Fed. R. Evid. 702)). Second, the court must determine whether the expert opinion is relevant and reliable. Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 589 (1993). Here, the two enquiries are intertwined— Officer Merino's expertise is based primarily on his experience, although he has received some training in gang issues.

**Officer Merino's Qualifications and the Bases of his Opinions**

The Government described both Officer Merino's qualifications and the bases of his opinion as stemming from a number of areas:

> First, Officer Merino worked as a school security advisor in the Salt Lake School District for a year where he monitored gang activity in the schools, intervened in violent acts by TCG and other gang members, and debriefed TCG members.
> Second, Officer Merino had continued interaction with the Polynesian community and TCG members as a patrol officer in the Salt lake City Police Department on the West Side Patrol Unit for over four years. During his years there, Officer Merino made contacts with and interacted with Polynesian community leaders, religious leaders, community youth, concerned citizens and TCG members during his shifts in that Unit. He responded to calls of criminal activity committed by TCG members and arrested and interviewed TCG members and associates. He has spent numerous hours talking with current and former TCG members about the gang, membership, lifestyle and activities. He also spent many hours getting information from Polynesian community leaders about TCG and attending training regarding gangs.
> Third, Officer Merino was transferred to the Gang Unit of the Salt Lake City Police Department, and initially performed gang suppression duties for two years. While there he attended gang conferences and received training on TCG as well as other gangs, he attended local and departmental gang training, and learned about gangs from other experts in the area and the police department. His daily job was to patrol the west side of Salt Lake City in the areas of highest gang activity. Part of those duties includ[ed] talking with TCG members on the street and taking note of their associations, vehicles, homes and hangouts. Officer Merino also conducted surveillance of TCG members and their activities and debriefed members about their activities. His job also included assisting other officers in identifying gang members and associates.
> Fourth, Officer Merino was promoted to Detective in the Gang Investigation Unit and was assigned to investigate gang crimes, and specifically all criminal activity committed by TCG. For approximately three years, Detective Merino focused nearly full time on investigating all aspects of TCG, including its members,

3

associates and criminal activity, as well as working with the Polynesian community regarding gang issues.

Fifth, and finally, Officer Merino has read police reports by other law enforcement officers regarding the identification of TCG members and associates, and has spoken with other officers regarding their interactions and interviews with TCG members and associates. He has watched and sat in on interviews with TCG members and viewed photographs and internet postings of TCG members and associates. He has also seen videos and photographs of TCG members hanging out, throwing gang signs, getting tattoos and committing crimes.

(Gov't Supplemental Notice [Dkt. No. 517] at 3-4.)

During the Daubert hearings, Officer Merino clarified and expanded on his experience investigating the TCG. Because at the time Officer Merino was transferred to the gang investigative unit "TCG . . . was a pretty prominent gang causing a lot of problems in the city," Officer Merino "was assigned to collect intelligence and investigate all crimes related to them." (May 6 Tr. at 16.) Officer Merino detailed the responsibilities that came with this assignment:

> Any crimes that were committed by any Polynesian gang members were sent to me. I would do all the follow-up investigation, contacting the victims, suspect witnesses . . . My primary responsibility was to collect intelligence on the [TCG] gang, and then disseminate it to our gang suppression unit that would take a proactive enforcement approach to them.

(Id. at 17.) In this position, Officer Merino spoke with TCG members on a daily basis. (Id. at 21-22.)

Officer Merino also described in greater detail the training on gang issues that he has received. During the time Officer Merino worked for the Salt Lake School District, he was "sent to the Salt Lake Area Gang Conference to receive some training on the [TCG] gang." (Id. at 22.) The school also paid for Officer Merino to receive training from the FBI violent crimes task force on "a fairly regular basis, about quarterly, on current trends and, you know, anything dealing with the gang at that time, . . . they would update us with it and provide any training for identification

4

purposes and things along those lines." (Id. at 22.)

Officer Merino continued to receive training on gang issues once he was hired by the Salt Lake City Police Department:

> Through the academy we had at least a two day class on gang identification, active gangs in the area, common friends, and activities of the gangs. Then as we went into our in-house academy, which was another 16 weeks, we were provided regular training throughout the course of that 16 weeks by our . . . interagency gang unit on our gangs and how to deal with them, what to be looking for, what to identify, how to deal with them when you're in an enforcement capacity.

(Id. at 23.) After being assigned to the gang investigation unit, Officer Merino attended gang conferences locally and in Las Vegas. He described these conferences as "workshops where it's just one class after another." (Id. at 27.) In addition, Officer Merino has been an instructor at several local gang conferences dealing with Polynesian gangs and the TCG. (Id. at 28.) He has also worked closely with and provided training to gang investigators in Los Angles, Reno, and Las Vegas. (Id. at 27-28.)

But during the hearing, Officer Merino made clear that most of his knowledge about the TCG came from gang members themselves: "And I think it's important to clarify that most of my education as far as the gang did not come from police officers. It actually came from former and current gang members." (Id. at 34.)

**Officer Merino's Proposed Opinions**[2]

Specifically, according to the United States, Officer Merino's opinions will cover:

(A) the origin and evolution of TCG in Inglewood, California and the affiliation with "Crip" gangs generally,
(B) the spread of TCG to Salt Lake City, Utah and elsewhere,
(C) the organizational structure of TCG (generations and families),
(D) membership rites and initiation processes ("jumping in" and "putting in work"),
(E) indicia of gang membership (colors, tagging, hand signs, clothing, symbols and numbers, tattoos, media and music),
(F) meetings and gatherings of the members, photographs, graffiti and lists of members,
(G) the rules of the gang, including confrontations with rival gang members and cooperation with law enforcement.
(H) discipline imposed by the gang for breaking rules,
(I) the role of violence and intimidation in furthering the goals of the gang,
(J) communications with gang members on the street and while incarcerated,
(K) the use of gang associates and affiliates to facilitate and support gang activities,
(L) the activities of the gang, including signature crimes, robberies, carjackings, thefts of motor vehicles, possession of weapons, assaults, drive-by shootings, and other criminal activity,
(M) the various methods of communication among gang members, including cellular telephones, the internet and social media, and mainstream news media,
(N) the relationship of TCG to rival gangs as well as associated or affiliated gangs, and
(O) that the charged defendants are members and/or associates of TCG based upon factors including, but not limited to: self proclamation, photographs showing gang involvement, gang tattoos, gang attire, gang signs or posturing, arrests and commission of crimes with known gang members, gang monikers and/or information from reliable sources.

(Gov't Supplemental Notice [Dkt. No. 517] at 2-3.)

---

[2] The Government notes that, "[s]eperate from his testimony as an expert witness, Officer Merino may also testify as a fact witness regarding the identification of an individual as a member of TCG based upon proclamations made by that person to him, and upon his personal observations and interactions." (Gov't Supplemental Notice [Dkt. No. 517] at 3, n.1.) To the extent that Officer Merino should also testify as a fact witness during trial, the court will assess the admissibility of his testimony as it would for any other fact witness, and offer an appropriate limiting instruction to the jury.

**Defendants' Objections**[3]

The Defendants do not appear to contest that Officer Merino is qualified to testify about certain general aspects of TCG such as background, structure, operation and organization. They do take issue with Officer Merino's more specific opinions including whether certain Defendants are members of the TCG. Their objections are two-fold. First, that Officer Merino would simply be relaying hearsay from gang members and people in the community to the jury. Second, that much of Officer Merino's proposed testimony is within the grasp of the jury without the help of an expert. In making these objections Defendants rely on several Second Circuit decisions, including United States v. Mejia, 545 F.3d 179 (2d Cir. 2008) and United States v. Dukajini, 326 F.3d 45 (2d Cir. 2003).

In Mejia, the court discussed the proper subjects of a law enforcement officer's expert testimony: "[J]ust as an anthropologist might be equipped by education and fieldwork to testify to the cultural mores of a particular social group . . . law enforcement officers may be equipped by experience and training to speak to the operation, symbols, jargon, and internal structure of criminal organizations." 545 F.3d at 190 (internal citation omitted). But the line between admissible and inadmissible expert testimony is often difficult to discern. Whether an expert's testimony is admissible depends on the subjects about which the expert testifies and the sources on which the expert relies. See id. at 194 (addressing defendants' arguments as to each in turn).

**The Appropriate Boundaries of Expert Testimony**

"Testimony is properly characterized as 'expert' only if it concerns matters that the

---

[3]Because the Defendants make similar arguments, the court discusses them together.

average juror is not capable of understanding on his or her own." Id. In Mejia, the defendants contended that several portions of the law enforcement expert's testimony were outside the scope of expert testimony because the subject of the testimony was readily understandable by the jurors. The law enforcement expert had testified, among other things, that "the FBI gang task force had seized '[p]robably between 15 and 25' firearms, as well as ammunition, from MS-13 [gang] members; . . . MS-13 [gang] members on Long Island had been arrested for dealing narcotics; and . . . MS-13 [gang] had committed 'between 18 and 22, 23' murders." Id. at 194-95. The court found that this testimony should not have been admitted because it was not helpful. Although the expert testimony "might have been helpful in establishing the relationship between these facts and MS-13, . . . it was not helpful in establishing the facts themselves." Id. at 195. The court pointed out that if the Government had introduced evidence such as "lay witness testimony, arrest records, death certificates, and other competent evidence of these highly specific facts," the jury could have understood the evidence without the aid of an expert. Id. Accordingly, the expert testimony, which "went far beyond interpreting jargon or coded messages, describing membership rules, or explaining organizational hierarchy" was inadmissible. Id. (internal citations omitted).

**Expert's Reliance on Inadmissible Evidence**

Although experts "can testify to opinions based on inadmissible evidence, including hearsay," they may not "simply transmit that hearsay to the jury." Id. at 197. "Instead, the expert must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissable materials. Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever.'" Id. (quoting United States v. Dukagjini, 326 F.3d 45, 58-59

8

(2d Cir. 2003)) (internal citations omitted).

The defendants in Mejia also challenged the basis for the law enforcement expert's testimony, claiming that he relied on inadmissible hearsay in forming his conclusion. The expert "unquestionably relied on hearsay evidence," which included statements by MS-13 gang members, statements made by other law enforcement officers, statements from intercepted telephone conversations among MS-13 gang members, and printed and online materials. Id. at 197. Although the expert's reliance on such sources of information was permissible, much of his testimony was inadmissible because it "involved merely repeating information he had read or heard." Id. The law enforcement expert could not "explain how he had pieced together bits of information from different sources and reached a studied conclusion," which evidenced that he did not "analyze his source materials so much as repeat their contents." Id. at 198. The court found that such evidence violated Rule 703 of the Federal Rules of Evidence as well as Crawford v. Washington, 541 U.S. 36 (2004).

But "[a]s long as [the expert] is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no Crawford problem. The expert's opinion will be an original product that can be tested through cross-examination." United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009). In Johnson, the Fourth Circuit distinguished Mejia and upheld the trial court's admission of law enforcement experts' testimony about the meaning of certain words heard in intercepted phone calls. The court found that the testimony at issue was unlike that in Mejia, where "it was hard to believe that [the expert] applied any independent expertise to the substance of his testimony," because the Johnson experts "were applying their expertise, derived over many years and from multiple sources." Id.

9

at 636. A year later, in United States v. Ayala, 601 F.3d 256 (4th Cir. 2010), the Fourth Circuit again distinguished Mejia and upheld the trial court's admission of law enforcement experts' testimony on the history, structure, and practices of the MS-13 gang. Unlike in Mejia, the experts in Ayala offered "their independent judgments" which resulted from "many years of observing the gang, studying its methods, and speaking with its members." Id. at 275.

**Admissibility of Officer Merino's Opinions**

Based on its review of the caselaw, the transcripts of the hearings and the memoranda of the parties, the court concludes that Officer Merino is qualified to testify as an expert at trial on the general subjects covering the background, structure and organization of the TCG, that is, 1(A) through 1(N) of the United States' Supplemental Notice (Dkt. No. 517).[4] The opinions contained in these subsections do not involve "highly specific facts," but rather areas of testimony that will be helpful to explain the relationship between facts presented and the TCG. And, in arriving at the opinions contained in 1(A) through 1(N), Officer Merino applied his individual judgment and "expertise, derived over many years and from multiple sources." See Johnson, 587 F.3d at 636.

The court will take under advisement those areas covered in subsection 1(O) of the Supplemental Notice until after hearing the evidence at a Daubert hearing, to be held during the first week of trial, outside the presence of the jury. At that hearing, Officer Merino will testify about the subjects listed in 1(O) of the Supplemental Notice as they relate to a particular

---

[4]This ruling is based on the court's reading of those sections of the Supplemental Notice as covering Officer Merino's opinions on general areas, much like "a sociologist describing the inner workings of a closed community," which are properly within the bounds of expert testimony. Mejia, 545 F.3d at 190.

Defendant, and any other opinion that a particular Defendant challenges as bearing on his own criminality. See Mejia, 545 F.3d at 190 ("As the officer's purported expertise narrows from 'organized crime' to 'this particular gang,' from the meaning of 'capo' to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them."). The Defendants will have an opportunity to cross-examine Officer Merino at the hearing.

**CONCLUSION**

For the foregoing reasons, Defendants' Motions in Limine to Exclude the Testimony of Officer Merino (Dkt. Nos. 362, 540, 544, 757) are DENIED IN PART—Officer Merino may offer expert testimony on the general subjects covering the background, structure and organization of the TCG, that is, 1(A) through 1(N) of the United States' Supplemental Notice (Dkt. No. 517). The court TAKES UNDER ADVISEMENT whether Officer Merino may offer expert testimony that individual Defendants are members or associates of TCG. The court sets a Daubert hearing on this matter for Friday, September 9, 2011, at 2:00.[5]

SO ORDERED this 30th day of August, 2011.

BY THE COURT:

_/s/ Tena Campbell_
TENA CAMPBELL
United States District Judge

---

[5] Mr. Moa's Motion in Limine to Prohibit Break Merino from Testifying that Charles Moa is a Member of TCG (Dkt. No. 740) will be heard at that time.