IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ERIC KAMAHELE, KEPA MAUMAU, SITAMIPA TOKI<br><br>Petitioners,<br><br><br><br>vs.<br><br><br><br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | ORDER AND MEMORANDUM DECISION DENYING PETITIONERS' MOTIONS FOR RELIEF UNDER 28 U.S.C. § 2255<br><br><br>Case Nos. 2:15-cv-00506-TC<br>2:15-cv-00600-TC<br>2:16-cv-00730-TC<br><br><br>Judge Tena Campbell |

A jury convicted Eric Kamahele, Kepa Maumau, and Sitamipa Toki (collectively, Petitioners) of crimes arising out of their membership in the Tongan Crip Gang (TCG). They appealed their convictions to the Tenth Circuit Court of Appeals and lost. See United States v. Kamahele, 748 F.3d 984 (10th Cir. 984). Petitioners have now filed motions under 28 U.S.C. § 2255. Mr. Kamahele and Mr. Maumau initially filed pro se § 2255 motions claiming ineffective assistance

of counsel. After receiving permission from the court, Mr. Kamahele and Mr. Maumau, with the assistance of counsel, filed amended § 2255 motions. Mr. Toki did not file a pro se motion, but has now, with counsel, filed a § 2255 motion.

Other than the claims raised by Mr. Kamahele and Mr. Maumau in their pro se motions, the petitioners make essentially the same arguments in support of their motions:

(1) That the Supreme Court's recent decision in <u>United States v. Johnson</u> invalidates the risk-of-force clause in 18 U.S.C. § 924(c)(3)(B) and, consequently, their § 924(c) convictions cannot stand; and

(2) That they are actually innocent of their convictions for committing violent crimes in aid of racketeering (VICAR) and their gun charges, 18 U.S.C. § 924(c), because their underlying crimes do not qualify as crimes of violence.

The court denies Petitioners' motions:

(1) The ineffective-assistance-of-counsel claims asserted by Mr. Kamahele and Mr. Maumau are without merit;

(2) Petitioners' claims that <u>Johnson</u> invalidated their 924(c) convictions are time-barred;

(3) Petitioners' claims do not qualify for the actual-innocence exception and, consequently, they are also barred.

## INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS

To succeed on their claims of ineffective assistance of counsel, Mr. Kamahele and Mr. Maumau must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under the first prong, the petitioner must show that his attorney's representation fell below an objective standard of reasonableness. Id. at 688. "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. As part of that deferential standard, the United States Supreme Court has established "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (emphasis added) (citation and internal quotation marks omitted).

Second, the petitioner must establish that he was prejudiced by the allegedly deficient representation. Id. at 687, 693 (the petitioner must "affirmatively prove prejudice"). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at

693 (emphasis added). Instead, when a petitioner challenges a conviction, he "must show that there is a reasonable probability that, but for counsel's professional errors, . . . the factfinder would have had a reasonable doubt respecting guilt." Id. at 694–95. Underlying this standard is the requirement that the court "consider the totality of the evidence before the judge or jury." Id. at 695.

The court may reverse the order in which it considers the factors, or it may focus solely on one of the factors if the petitioner cannot establish that particular factor.

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.

Id. at 697.

As discussed below, the court finds that neither Mr. Kamahele nor Mr. Maumau has met his burden under Strickland.

## I.  Eric Kamahele

Mr. Kamahele brings five claims in his Original Petition.[1]  Claim One and Claim Two concern his motion to withdraw his guilty plea.  Claims Three, Four, and Five relate to two events that occurred at trial which he contends should have triggered a motion for mistrial.

### a.  Withdrawal of Guilty Plea (Claims One and Two)

Eric Kamahele was indicted on five counts (conspiracy under RICO, assault with a dangerous weapon in aid of racketeering, Hobbs Act robbery, and two counts of brandishing a firearm during a crime of violence).  He faced a potential sentence of life in prison, including a set of minimum-mandatory sentences.

> At the arraignment on the second superseding indictment on May
> 12, 2010, Kamahele was advised of his rights and of the possible

---

[1]The Government incorrectly asserts that Mr. Kamahele's petition was untimely because the court did not receive the petition until July 16, 2015, nine days after the July 7, 2015 deadline.  The court, applying the prison-mailbox rule, finds that Mr. Kamahele filed a timely petition.  That rule deems timely a pro se prisoner's filing of a § 2255 petition when the prisoner gave the petition "to prison officials for mailing prior to the filing deadline, regardless of when the court itself receives the documents."  Price v. Philpot, 420 F.3d 1158, 1163-64 (10th Cir. 2005).  Mr. Kamahele mailed his pro se petition from prison on July 1, 2015 (see the accompanying envelope), six days before the deadline expired.

penalties he faced if convicted. (Doc. 142.) There, both he and his counsel were put on notice that he was facing a minimum-mandatory 32 years in prison if convicted.

(United States' Response in Opp'n to Pet.'s Mot. to Vacate Under 28 U.S.C. § 2255 6 n.1, ECF No. 5 in 2:15-cv-506.)

A 30-day trial was scheduled to begin on September 6, 2011. But on August 11, 2011, Mr. Kamahele pleaded guilty to two of the five counts for which he was indicted. According to his plea agreement, he was to serve twelve years in prison. The plea was conditional because it was entered under Federal Rule of Criminal Procedure 11(c)(1)(C), which requires acceptance by the district court before it is final.

The next day, Mr. Kamahele "had a change of heart" after Co-Defendant Mataika Tuai asked him to "withdraw [his] guilty plea and help [Mr. Mataika] at trial." (Aff. of Eric Kamahele ¶ 5, ECF No. 1-2 in 2:15-cv-506.) Mr. Kamahele called his counsel's office and told his counsel's assistant that he wanted to withdraw his guilty plea. Six days later, on August 18, 2011, his counsel filed a motion with the court and represented what had occurred:

Mr. Kamahele contacted counsel's office and indicated he needed to withdraw the plea and that he would put the reasons for the motion in writing and send it to counsel's office. To date that letter has not been received and due to the time constraints counsel was unable to

verify with Mr. Kamahele what issues he wanted to raise before the Court.

(Def. Kamahele's Mot. to Withdraw His Guilty Plea, ECF No. 778 in 2:08-cr-758.) Counsel emphasized the need for an expedited hearing because the trial was less than a month away. (Id. ("Therefore, despite the lack of articulated facts, counsel seeks a hearing on the Motion in order to determine her client's status as to the trial.").) The court held a hearing the next day.

Mr. Kamahele and his counsel met at the courthouse immediately before the hearing. Mr. Kamahele, who was in custody during the pre-trial proceedings, said that he "never spoke to [his] attorney [about the motion] until the day" of the motion hearing. (Kamahele Aff. ¶ 6.) According to Mr. Kamahele, in response to his decision to withdraw his plea, his attorney told him that he "was the dumbest person she had ever met" and that the judge would not grant his request. (Id. ¶ 7.) He now asserts that he "was not provided any advice by [his] attorney at the plea withdrawal" hearing. (Id. ¶ 9.) But he did mention that his attorney had reviewed sentence possibilities with him, no doubt before he entered into his plea agreement. (Id. ¶ 8.) Still, he asserts that he asked his attorney "on multiple occasions to help [him] understand the amount of time [he] was facing, and that

each time the number was different and [it] prevented [him] from grasping the concept of federal mandatory minimum sentences." (<u>Id.</u> ¶ 8.)

The transcript of the hearing on Mr. Kamahele's motion completes the picture of what occurred between Mr. Kamahele and his counsel. After the court granted the motion, his counsel stated on the record that her client's request "was against legal advice." (Tr. of Hr'g on Mot. Withdraw Guilty Plea 4, ECF No. 826 in 2:08-cr-758.) She continued her explanation:

> Just because of the time he's facing, my concerns about the evidence at trial, that <u>my recommendation is that he let the plea stand</u>, and <u>he still wishes to have it withdrawn</u>. Obviously the court has ruled. But I wanted that [on the record.]
>
> And then I wanted to make sure that he understood. He indicated today that he thought I was mad and that it interfered with my schedule. That isn't the case at all. I was trying to pay attention to what the Government was talking about regarding evidence. My schedule is cleared for September. I did that in preparation of this. There is nothing personal here. I have no personal feelings about the client, what he wants to do, how he wants to proceed, other than to protect his legal rights. So that is why I asked him not to withdraw it. I just wanted that on the record.

(<u>Id.</u> at 4 (emphasis added).) The court told Mr. Kamahele that ultimately the decision was his to make but added that "I don't think [withdrawing the guilty plea is] the wisest thing in the world." (<u>Id.</u> at 3.)

Mr. Kamahele went to trial and the jury found him guilty of all five counts. He was sentenced to 32 years in prison.[2] He lost his appeal with the Tenth Circuit. See United States v. Kamahele, 748 F.3d 984 (10th Cir. 2014).[3]

### i. Attorney's Advice Regarding Withdrawal of Guilty Plea (Claim One)

In Claim One, Mr. Kamahele contends that his attorney provided ineffective assistance of counsel when she failed to provide him with meaningful advice about whether to withdraw his guilty plea. "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." Lafler v. Cooper, 566 U.S. 156, 168 (2012). The

---

[2] The court later re-sentenced Mr. Kamahele to 30 years after the United States Supreme Court issued Alleyne v. United States, 133 S. Ct. 2151 (2013). (See Aug. 26, 2013 Order of the Tenth Circuit Court of Appeals, ECF No. 1509 in 2:08-cr-758; Tr. of Sept. 18, 2013 Re-Sentencing, ECF No. 14 in 2:15-cv-506.)

[3] Mr. Kamahele requested an evidentiary hearing on his claim that he received ineffective assistance of counsel when he decided to withdraw his guilty plea (Claim One). (See Am. Mot. to Vacate at 30 n.146, ECF No. 10 in 2:15-cv-506.) The court may, in its discretion, hold an evidentiary hearing. See Rule 8(a) of the Rules on Mot. Attacking Sentence Under § 2255. Having reviewed Mr. Kamahele's affidavit (ECF No. 1-2 in 2:15-cv-506), the transcript of the hearing on Mr. Kamahele's motion to withdraw his guilty plea (ECF No. 826 (Sealed) in 2:08-cr-758), Mr. Kamahele's Motion to Withdraw his Guilty Plea (ECF No. 778 in 2:08-cr-758), and the other documents filed in Mr. Kamahele's Section 2255 matter, the court finds that an evidentiary hearing is not necessary.

Strickland test "applies to challenges to guilty pleas based on ineffective assistance of counsel." Hill v. Lockhart, 474 U.S. 52, 58 (1985). The same applies to situations where a defendant rejects a plea offer. "Even if the trial is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." Lafler, 566 U.S. at 166. But to establish prejudice, the defendant must show, among other things, that "but for the ineffective advice of counsel there is a reasonable probability that . . . the defendant would have accepted the plea . . . ." Id. at 164. Mr. Kamahele has not done that.

Mr. Kamahele initially claims that he "was not provided any advice by [his] attorney at the plea withdrawal." (Kamahele Aff. ¶ 9.) But other statements in his affidavit contradict that assertion, including the fact that he met with her before the hearing. He says that he "never spoke with [his] attorney about withdrawing [his] plea until the day [he] was in Court on a 'Motion to Withdraw Plea.'" (Id. ¶ 6.) The time frame for action was so small—the trial was only weeks away—that his attorney cannot be faulted for meeting with him on the

hearing date, particularly because he was in custody, which adds a layer of difficulty to scheduling a meeting.

When Mr. Kamahele met with his counsel, she strongly advised against withdrawing his plea. She made a point of clarifying that on the record.

As for his most recent statement that he did not grasp "the concept of federal mandatory minimum sentences," (Id. ¶ 8), he cannot avoid the representations he made in his August 2011 Statement in Advance of Plea, which included the following: "I hereby acknowledge and certify that I have been advised of and that I understand the following facts and rights, and that I have had the assistance of counsel in reviewing, explaining, and completing this form." (Statement by Def. in Advance of Plea of Guilty 1, ECF No. 74 in 2:08-cr-758.) The statement listed the maximum sentence he was facing if he was convicted— life in prison. (Id. at 2 ¶ 2.)

Despite that, Mr. Kamahele chose not to follow his attorney's advice or heed the court's warning that withdrawing his guilty plea was not a wise choice. His decision does not render the assistance he received ineffective. For these reasons, he cannot overcome the strong presumption that his attorney's conduct

fell within "the wide range of reasonable professional assistance." <u>United States v. Carr</u>, 80 F.3d 413, 417 (10th Cir. 1996).

    ii.  <u>Due Process Claim Concerning Motion to Withdraw Guilty Plea (Claim Two)</u>

In Claim Two, Mr. Kamahele asserts that the district court erred when it allowed him to withdraw his guilty plea. This claim fails both for procedural reasons, and even if it were not procedurally barred, on the merits.

His claim of court error could have been raised on direct appeal but was not. "Section 2255 motions are not available to test the legality of a matter which should have been raised on direct appeal." <u>United States v. Warner</u>, 23 F.3d 287, 291 (10th Cir. 1994). Accordingly, Mr. Kamahele's claim is procedurally barred.

There are two exceptions to this bar. A court will consider a defaulted claim if the petitioner shows "either [1] cause excusing the procedural default and prejudice resulting from the error or [2] a fundamental miscarriage of justice if the claim is not considered." <u>United States v. Cox</u>, 83 F.3d 336, 341 (10th Cir. 1996). Mr. Kamahele has not explained why he did not, or could not, bring this claim on direct appeal, and nothing in the record hints at a situation prohibiting him from doing so. As for the fundamental-miscarriage-of-justice exception, the court will assume, without deciding, that he meets that exception and is entitled to

a review of the merits of his claim. For the reasons set forth below, Mr. Kamahele does not succeed on the merits.

On August 11, 2011, Mr. Kamahele pleaded guilty under Rule 11(c)(1)(C), which allowed him to withdraw his plea if the court did not accept the sentence agreed upon by the parties. (See Aug. 11, 2011 Minute Entry, ECF No. 742 in 2:08-cr-758; Aug. 11, 2011 Statement in Advance of Plea, ECF No. 744 in 2:08-cr-758.) The very next day, Mr. Kamahele asked his lawyer to assist him in withdrawing his guilty plea. (See Tr. of Aug. 19, 2011 Hr'g on Mot. to Withdraw Guilty Plea, ECF No. 826 in 2:08-cr-758.) He filed his motion one week later.

The procedure set forth in Federal Rule of Criminal Procedure 11(d)(1) applied because the court had not yet accepted Mr. Kamahele's Rule 11(c)(1)(C) plea. According to that rule, "[a] defendant may withdraw a plea of guilty . . . before the court accepts the plea, for any reason or no reason." Fed. R. Crim. P. 11(d)(1). In his motion Mr. Kamahele did not provide a reason to the court.[4] During the hearing, the court considered the fact that the guilty plea was an

---

[4]In Mr. Kamahele's affidavit, which was attached to his Petition, he said that on August 12, 2011, one of his Co-Defendants asked him to withdraw his guilty plea so Mr. Kamahele could "help him at trial." (Kamahele Aff. ¶ 4.) That information was not given to the court until Mr. Kamahele filed his current petition.

11(c)(1)(C) plea and that Mr. Kamahele had moved to withdraw his guilty plea only one week after he entered his plea. "That speed is one of the big factors. That means that nobody is prejudiced. The Government hasn't called off witnesses or anything." (Tr. of Aug. 19, 2011 Hr'g on Mot. Withdraw Guilty Plea 2.) Because his motion satisfied the factors under Rule 11(d)(1), the court gave him permission to withdraw his plea. Ultimately, as the court reminded him, it was his decision. But the court added that withdrawing his plea was not a wise choice. Despite the court's statement, and against the legal advice of his attorney, Mr. Kamahele decided to withdraw his plea and go to trial.

Given the fact that Mr. Kamahele had the option to withdraw his guilty plea "for any reason or no reason" and the fact that he consulted with his attorney before doing so, the court deferred to Mr. Kamahele. <u>See</u> Fed. R. Crim. P. 11(d)(1). The appropriate procedures were followed. No violation of Mr. Kamahele's due-process rights occurred and he has not established that he is entitled to relief under Claim Two.

### b. Trial (Claims Three, Four, and Five)

Mr. Kamahele's remaining ineffective-assistance-of-counsel claims concern events that happened during selection of the jury and testimony during

trial.  In Claim Three, he alleges that his trial attorney was ineffective when she did not move for a mistrial after a few potential jurors briefly saw him shackled and wearing prison clothes.  Claim Four is an extension of Claim Three: in Claim Four he contends that his appellate attorney did not raise the mistrial issue on direct appeal.  In Claim Five Mr. Kamahele focuses on his counsel's failure to raise a claim of prosecutorial misconduct after a government witness refused, while on the stand, to testify.  In that claim, he contends that his counsel was ineffective because failure to raise the issue at trial limited him to the onerous plain-error standard of review on appeal.  As explained below, none of these claims pass the <u>Strickland</u> test.

i.  <u>Prison Garb and Shackles (Claims Three and Four)</u>

During pre-trial proceedings, Mr. Kamahele was in custody.  Each day, before the proceedings in the courtroom began, the United States Deputy Marshals transported Mr. Kamahele to the courtroom holding cell where he changed into civilian clothes.  The court allowed Mr. Kamahele to change into civilian clothes so the potential jurors, and ultimately the jury panel, did not see evidence that he was in custody.  But at all other times, Mr. Kamahele remained shackled and in prison garb.

Immediately before the voir dire process began, a small group of potential jurors, on their way to the fourth-floor courtroom, inadvertently rode the elevator to the basement. At the same time, Mr. Kamahele and other Co-Defendants, while in the custody of U.S. Deputy Marshals, waited in the basement to catch the same elevator. When the potential jurors' elevator stopped, the doors opened, revealing the shackled Co-Defendants in their prison garb, including Mr. Kamahele. The potential jurors stayed in the elevator, the elevator doors closed, and the Co-Defendants caught the next elevator. Mr. Kamahele's Co-Defendant Kepa Maumau told his attorney about the encounter, who brought it to the court's attention. (See Sept. 6, 2011 Trial Tr. at 23, ECF No. 1359 in 2:08-cr-758.)

During voir dire, the court attempted to determine which potential jury members had witnessed the shackled Co-Defendants. Three people—Juror Numbers 15, 63, and 76—raised their hands. Juror Numbers 63 and 76 were not chosen for the panel. The court questioned Juror Number 15 outside the presence of the voir dire panel and in the presence of the attorneys. The following conversation occurred:

THE COURT:      This morning I guess you got on the elevator to
                go up and it went down; right?

JUROR NO. 15:   Yes.

16

THE COURT:     And the door opened?

JUROR NO. 15:   Yes.

THE COURT:     What did you see?

JUROR NO. 15:   Some prisoners in handcuffs.

THE COURT:     Okay.  Did you recognize any of them?

JUROR NO. 15:   I seriously did not focus on their faces.

THE COURT:     All right.

JUROR NO. 15:   I couldn't pick any of them out in the lineup or anything.

THE COURT:     And you recognize that although I always think I am the only show in town, that there are other courtrooms going on –

JUROR NO. 15:   Yes.

THE COURT:     – and other trials.

JUROR NO. 15:   Yes.  I didn't think anything of it.

THE COURT:     Okay.  The fact that in this building there might be people who are in handcuffs, would that affect your ability to be impartial?

JUROR NO. 15:   No.

THE COURT:     All right, questions.

MR. METOS:     How long was the observation?

| | |
|---|---|
| JUROR NO. 15: | About 20 seconds, just long enough for the doors to shut again. It wasn't very long. |
| MR. METOS: | The door open and shut and that's it? |
| JUROR NO. 15: | Uh-huh. |
| THE COURT: | You didn't look at anything? You can't remember anything about anybody? |
| JUROR NO. 15: | I seriously didn't. I didn't think anything of it until you asked that question again this morning. |
| THE COURT: | Any questions over here? Ms. Skordas? |
| MS. SKORDAS: | No. |
| THE COURT: | Anybody else? United States? |
| MS. TRAVIS: | Nothing, your honor. |
| THE COURT: | Everything's that's happened so far as you think about it, think you could be fair in this case to both sides? |
| JUROR NO. 15: | Yes. |

(Sep. 6, 2011 Trial Tr. 191–92.)

None of the attorneys asked the court to strike Juror Number 15 for cause.

And the court found no cause to dismiss Juror Number 15. Later, Mr. Kamahele

asked his appellate counsel to raise the issue in his direct appeal, but she did not.

(Kamahele Aff. ¶ 13.)

Mr. Kamahele contends that his attorney provided ineffective assistance when she did not appeal the court's decision to keep those members on the list of potential jurors. But it was objectively reasonable for an attorney to decide not to appeal the court's decision.

First, the Tenth Circuit Court of Appeals has rejected arguments very similar to the one Mr. Kamahele makes now. In United States v. Simpson, the Tenth Circuit said that "this circuit, as well as many others, has held that an isolated view by jurors of a defendant in handcuffs does not justify a new trial in the absence of a showing of actual prejudice." 950 F.2d 1519, 1522 (10th Cir. 2014).

Second, Mr. Kamahele's situation falls within the four corners of United States v. Johnson, in which the Tenth Circuit held that "a juror's fleeting glance of a defendant in handcuffs [did] not warrant a mistrial . . . [when] [t]he trial court made a full inquiry as to whether this incident would prejudice the jury [and] [n]o juror indicated any ability to be impartial." 911 F.2d 1394, 1397 (10th Cir. 1990) (citations and internal quotation marks omitted). Here, two of the three individuals who saw Mr. Kamahele in his prison garb never served on the jury and no evidence suggests that their experience affected the individuals who were

chosen to be on the jury. The third individual who did serve on jury (Juror No. 15) indicated an ability to be impartial.

Given the deference the court must give to the attorney's decisions, the court finds that Mr. Kamahele's counsel's decision to forego a challenge was objectively reasonable.

### ii. Prosecutorial Misconduct (Claim Five)

During trial, the United States called Mr. Epeti Maa to testify. The Tenth Circuit summed up the situation:

> When the prosecutor asked Mr. Naa whether he lived in Utah, he refused to answer. When asked if he had heard the question, Mr. Naa replied that he had, but that he "actually didn't want to have anything to say." At that point, the district court excused the jury.
>
> When questioned by the district court, the prosecutor admitted that he had known that Mr. Naa was "unhappy about being here" and "not [in] a comfortable situation," but had not known that Mr. Naa would refuse to answer a single question. The district court accepted this explanation and found that the prosecutor had not committed misconduct.

United States v. Kamahele, 748 F.3d 984, 1018 (10th Cir. 2014) (citation and internal quotation marks omitted).

Because Mr. Kamahele's counsel did not contemporaneously object or move for a mistrial, Mr. Kamahele was confined to the "plain error" standard of

review on appeal.  See id. at 1018.  Under that standard "the defendant must show that the district court erred, that the error was plain, that the error affected his substantial rights, and that the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings."  Id. at 1018 (citation and internal quotation marks omitted) (alteration in original).

The Tenth Circuit, applying that standard, upheld the court's finding that no prosecutorial misconduct occurred.  It found no obvious error and concluded that Mr. Kamahele's "substantial rights were not involved" because "[t]he trial involved eight defendants, and the jury had no reason to suspect that Mr. Naa would testify about Mr. Kamahele."  Id. at 1018.

Mr. Kamahele was not prejudiced by the plain-error standard applied on appeal because the outcome on appeal would have been the same even if Mr. Kamahele's counsel had moved for a mistrial (which would have invoked the more lenient harmless-error standard).  Rule 52 of the Federal Rules of Criminal Procedure provides the harmless-error and plain-error standards of review.  The court applies the harmless-error standard if the party objected during trial: "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed. R. Crim. P. 52(a).  But if a party fails to object at the trial

stage, the court reviews the decision for plain error. Fed. R. Crim. P. 52(b). And a "plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Id.

Under Rule 52(b)'s plain-error standard, the court first determines whether the error was "plain," which has also been referred to as "clear" or "obvious." United States v. Olano, 507 U.S. 725, 734 (1993). If the error was plain, the court must determine whether the error "affected substantial rights." Fed. R. Civ. P. 52(b). That language "is the same language employed in Rule 52(a), and in most cases it means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734.

The only distinction between the harmless-error and plain-error standards of review is where the burden lies. "Rule 52(b) normally requires the same kind of inquiry [applied in a harmless-error standard of review], with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Id. The burden shifting "is dictated by a subtle but important difference in language between two parts of Rule 52: While Rule 52(a) precludes error correction only if the error does not affect substantial rights', Rule 52(b) authorizes no remedy unless the error does affec[t] substantial

rights." Id. at 734–35 (citation and internal quotation marks omitted) (emphasis and alteration in original).

Here, the Tenth Circuit found that the court did not commit plain error. See Kamahele, 748 F.3d at 1018. But "[e]ven if the finding constituted an obvious error, . . . reversal would be unwarranted because Mr. Kamahele has not shown any effect on his substantial rights. . . . The trial involved eight defendants, and the jury had no reason to suspect that Mr. Naa would testify about Mr. Kamahele." Id. (internal citation omitted).

Because the Tenth Circuit found no error, the issue of whether Mr. Kamahele's attorney objected at trial had no bearing on the outcome. The result would have been the same regardless of whether the plain-error or the harmless-error review standard was applied. See also United States v. Walsh, Case No. 14 C 6537, 2016 WL 561908, *6 (N.D. Ill. Feb. 12, 2016) (finding that a § 2255 petitioner was not prejudiced because the appellate court "considered the arguments that [petitioner] forfeited and rejected them" so "[e]ven if his attorney had objected and preserved the ability to challenge the [ruling] on appeal," the result would have been the same). Ultimately, Mr. Kamahele cannot show prejudice under the Strickland standard.

\* \* \*

For the foregoing reasons, the court denies all of the claims Mr. Kamahele raised in his original petition.

## II.  Kepa Maumau

Kepa Maumau brings eleven claims alleging ineffective assistance by his trial counsel.[5]  Some of his claims share common themes, so the court categorizes Mr. Maumau's claims below based on the relevant events.

### a. Gen-X Store Robbery Investigation (Claim One)

Mr. Maumau asserts that his counsel was ineffective because she failed to investigate the Gen-X store robbery, including failing to interview the three Gen-X witnesses who identified him as one of the robbers.  One of those witnesses was Edward Kamoto, his accomplice.

The Gen-X robbery served as a predicate act for the Government's RICO claim.  (See Second Superseding Indictment, ECF No. 114 in 2:08-cr-758.)  The robbery was one of nine predicate acts charged against Mr. Maumau in the Second Superseding Indictment.  (Id.)  The Government needed to prove two of

---

[5] Mr. Maumau also requested an evidentiary hearing.  (See Maumau Am. Petition at 31, ECF No. 10 in 2:15-cv-600.)  The record is sufficient to determine Mr. Maumau's claim, so no evidentiary hearing is necessary.

the predicate acts. <u>See</u> 18 U.S.C. § 1961(5) (providing that a "'pattern of racketeering activity' requires at least two acts of racketeering activity"). The jury found Mr. Maumau guilty of five predicate acts, including the Gen-X robbery. (<u>See</u> Special Verdict for Kepa Maumau, ECF No. 1109 in 2:08-cr-758.) Even if Mr. Maumau's counsel successfully defended him from conviction of the Gen-X robbery, it would not matter because the jury found Mr. Maumau guilty of four other acts, none of which he discusses in his petition. Accordingly, he cannot establish prejudice based on his trial counsel's failure to investigate the facts of the Gen-X robbery.

### b. Expert Witness Break Merino (Claims Two and Ten)

Mr. Maumau contends that his attorney was ineffective because she did not challenge the qualifications and opinions of the Government's gang expert, Break Merino (Claim Two), and did not object to Mr. Merino's trial testimony (Claim Ten).

Despite Mr. Maumau's representation to the contrary, his attorney <u>did</u> file a motion to exclude Break Merino's testimony. (<u>See</u> Fangupo Mot. to Exclude Break Merino as Expert Witness, ECF No. 362 in 2:08-cr-758; Kepa Maumau's Mot. for Joinder in Fangupo Mot., ECF No. 378; Order granting Mot. for Joinder,

ECF No. 379.)  Moreover, the court held a <u>Daubert</u> hearing to test Mr. Merino's qualifications and opinions.

Lastly, Mr. Maumau's attorney (as well as other defense attorneys) cross-examined Mr. Merino at trial.  (<u>See</u> ECF Nos. 1353 and 1368 in 2:08-cr-758.) Mr. Maumau takes issue with the content of his attorney's cross-examination (<u>see</u> Maumau Original Petition 33, ECF No. 1 in 2:15-cv-600), but Mr. Maumau's strategic differences fail to show that his attorney's performance fell below an objective standard of reasonableness, particularly given the high deference the court must pay to counsel.  Furthermore, Mr. Maumau does not establish how the alleged error could have had any "conceivable effect on the outcome of the proceeding," much less that "there is a reasonable probability that, but for counsel's professional errors, . . .  the factfinder would have had a reasonable doubt respecting guilt." <u>Strickland</u>, 466 U.S. at 693–95.

Claims Two and Ten fail both prongs of the <u>Strickland</u> test.

### c.  Evidence of Mr. Maumau's Involvement In a Conspiracy (Claims Three and Four)

Mr. Maumau insists that if his attorney had interviewed Edward Kamoto, the Government's fact witness, she would have found evidence that Mr. Maumau was not part of the conspiracy alleged in the Indictment.  Mr. Kamoto, when

interviewed by the FBI, identified Mr. Maumau as his accomplice in a series of robberies. Mr. Maumau asked his attorney "to investigate and interview Edward Kamoto about the robberies and their relation to TCG." (Original Petition of Kepa Maumau at 18, ECF No. 1 in 2:15-cv-600.) He asserts that she would have gathered evidence that the robberies were not committed in furtherance of TCG. If she had done that, he maintains, she "would have been prepared to elicit favorable testimony from Kamoto that would have changed the outcome of the proceeding." (<u>Id.</u> at 21.)

But at trial, Mr. Kamoto "testified that he and Mr. Kepa Maumau were TCG members, that TCG members were expected to commit crimes, and that criminal activity served to advance their reputations in the gang." <u>Kamahele</u>, 748 F.3d at 1010. He "also testified that the crimes had raised his status in the gang and that he had received greater attention from fellow gang members upon his release from prison." <u>Id.</u> Then the "Exit Plan," in Mr. Maumau's own words, "described his involvement in TCG and confirmed that he had committed the crimes to advance his reputation in the gang." [6] <u>Id.</u> The evidence was

_____

[6] Mr. Maumau incorrectly asserts that his attorney introduced the Exit Plan during trial. <u>See</u> <u>infra</u> discussion about Claim Nine.

overwhelming and anything Mr. Maumau suggests would have been solicited from Mr. Kamoto is contradicted by Mr. Kamoto's own testimony.

In Claim Four, which is similar to Claim Three, Mr. Maumau faults his attorney for failing to interview Co-Defendants Eric Kamahele and Mataika Tuai to also establish that his robberies were not committed in furtherance of TCG. For the same reasons the court rejects Claim Three, Mr. Maumau's Claim Four fails the <u>Strickland</u> test.

### d. Cross-Examination of Edward Kamoto (Claim Five)

According to Mr. Maumau, his attorney's cross-examination of Mr. Kamoto was ineffective and should have generated favorable testimony. His attorney did not ask Mr. Kamoto about the purpose of committing the robberies, which, Mr. Maumau says, would have resulted in statements that the crimes were not committed for the purpose of furthering TCG as an enterprise.

But Mr. Kamoto testified on direct examination that the crimes <u>were</u> committed for the purpose of furthering the purpose of TCG. It was objectively reasonable that Mr. Maumau's attorney did not ask questions that would re-hash testimony harmful to her client. Moreover, as Mr. Maumau notes in his original petition, counsel for Co-Defendants Daniel Maumau and Mr. Kamahele did bring

out favorable information that supported his contention that he did not commit the robberies to further his position in TCG. (See Maumau Original Petition 22-25.) So, according to Mr. Maumau's own petition, he was not prejudiced because the information he wanted his attorney to elicit was actually brought out on the stand.

For these reasons, his Claim Five fails the Strickland test.

### e. "Alternative Lines of Defense" (Claim Six)

Mr. Maumau contends that his attorney was ineffective because she failed to pursue a defense that would have negated any evidence of motive or intent on his part to commit the crimes charged. All he says to support this claim is that he "asked Counsel to consider Maumau's college receipts found in his car as evidence for motive or lack of intent defense." (Maumau Original Petition at 26.) When his counsel did not do so, she "failed to discover that [the] robberies were not related to TCG." (Id. at 27.) The court cannot see any relevant link between the college receipts, Mr. Maumau's motive and intent, and the purpose of the robberies, and Mr. Maumau does not elaborate. In the face of overwhelming evidence against him, he has not established any prejudice by the alleged failure of his attorney to consider the college receipts or use them to present a defense.

### f. "Meaningful Adverse Testing" of the Government's Case (Claim Seven)

This claim essentially re-asserts the arguments Mr. Maumau raises in his other claims (for example, Claims Two and Ten address his attorney's alleged failure to challenge the Government's expert witness Break Merino, and Claim Five concerns his attorney's alleged failure to effectively cross-examine Edward Kamoto). For the same reasons the court rejected those claims, the court rejects Mr. Maumau's Claim Seven.

### g. Jailhouse Telephone Call (Claim Eight)

Co-Defendant Eric Kamahele made a telephone call from jail that was recorded and admitted as evidence at trial. According to Mr. Maumau, he was wronged when his attorney failed to file a motion to suppress the recording and failed to object at trial to its admission. He says the recording harmed him because it tied him to the alleged conspiracy: "Maumau is assumed to have agreed to [sic] Eric Kamahele's statement" that Mr. Kamahele had to commit at least three crimes to further his position in TCG and that "[t]he jury was able to infer from Eric's phone call, [sic] the elements of an enterprise and that a conspiracy existed." (Maumau Original Petition 29–30.)

Mr. Maumau does not state why he thinks a motion to suppress or an objection would have successfully excluded the recording from evidence.  See, e.g., United States v. Alcorta, 853 F.3d 1123, 1140 (10th Cir. 2017) (holding that recorded jail telephone conversation was admissible against co-conspirators because it was made in furtherance of conspiracy); see also United States v. Apodaca, --- F. Supp. 3d ---, 2017 WL 1435715, at *3 (D.D.C. Apr. 21, 2017) (noting that the "vast weight of authority" demonstrates that a pre-trial detainee has no reasonable expectation of privacy in calls initiated from jail where prisoners are given notice that all telephone calls are monitored and recorded) (citing multiple authorities).  And the fact that the evidence was harmful does not lead to the conclusion that his attorney provided ineffective assistance of counsel or that, with its exclusion, "the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 694–95.  Mr. Maumau has not satisfied either Strickland prong for Claim Eight.

### h. "Exit Plan" (Claim Nine)

Mr. Maumau contends that his attorney improperly introduced the "Exit Plan" document into evidence.  But his attorney did not introduce the "Exit Plan"

into evidence; the Government did.  Accordingly, there is no factual basis to support his Claim Nine.

### i.  Cumulative Effect of Errors (Claim Eleven)

Mr. Maumau's claim of cumulative effect fails because the court holds that no error occurred.  "[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990).  In other words, "there is no holding of error, no error to cumulate, and no occasion to apply a cumulative-error analysis." Id. at 1472.

The only exception to this rule is when "the entire trial was so fundamentally unfair that defendant's due process rights were violated." Id. at 1471 n.8.  But this "fundamental fairness" analysis is "reserved for the most serious cases, which truly shock the conscience as well as the mind." Id. at 1477 (internal quotation marks and citation omitted).  Nothing in the record comes close to suggesting that the performance of Mr. Maumau's counsel or other circumstances at trial resulted in a fundamentally unfair trial for Mr. Maumau.

For the foregoing reasons, Mr. Maumau's Original Petition is denied.

## JOHNSON-BASED CHALLENGES TO 924(c) CONVICTIONS

Petitioners, relying on the Supreme Court's decision in <u>Johnson v. United States</u>, 135 S. Ct. 2551 (2015), contend that treating their underlying convictions as "crimes of violence" under 18 U.S.C. § 924(c)(3)(B) violates due process.  The Government responds that <u>Johnson</u> does not apply to § 924(c).

In <u>Johnson</u>, the Supreme Court held that the residual clause of the Armed Career Criminal Act (ACCA) is unconstitutionally vague.  <u>Id.</u> at 2557.  The ACCA's residual clause defines a "violent felony" as one that "involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii).

Section 924(c)(3) defines a "crime of violence" as a felony that:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (B) by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Section 924(c)(3)(B), often referred to as the "risk-of-force clause," is similar, though not identical, to the ACCA's residual clause.  <u>See</u> 18 U.S.C. § 924(e)(2)(B)(ii).

Petitioners assert that, in light of <u>Johnson</u>, the risk-of-force clause is unconstitutionally vague. Absent the risk-of-force clause, Petitioners claim that their underlying crimes cannot qualify as crimes of violence and their 924(c) convictions cannot stand.

"A district court is authorized to modify a Defendant's sentence only in specified instances where Congress has expressly granted the court jurisdiction to do so." <u>United States v. Blackwell</u>, 81 F.3d 945, 947 (10th Cir. 1996). Under 28 U.S.C. § 2255, a prisoner can move the court to vacate or correct a sentence if the sentence was unconstitutional or otherwise illegal.

Ordinarily, a petitioner has one year to file his § 2255 motion from "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). But when a petitioner asserts a right "recognized by the Supreme Court and made retroactively applicable to cases on collateral review," the one-year period begins to run from the "date on which the right asserted was initially recognized by the Supreme Court." <u>Id.</u> at § 2255(f)(3).

Here, Petitioners were convicted in 2011 and the Tenth Circuit decided their direct appeal on April 8, 2014. <u>See</u> <u>United States v. Kamahele</u>, 748 F.3d 984 (10th Cir. 2014). Mr. Kamahele and Mr. Toki did not seek review with the

Supreme Court, nor did they seek a rehearing with the Tenth Circuit. Accordingly, their convictions became final 90 days later—July 7, 2014. See United States v. Martin, 357 F.3d 1198, 1200 (10th Cir. 2004). Mr. Maumau sought a rehearing of his petition, which the Tenth Circuit denied on May 23, 2014, making his conviction final 90 days later—August 21, 2014. Id. Petitioners raised the Johnson-based challenges to their 924(c) convictions for the first time in the summer of 2016, all more than one year after their "judgement of conviction" became final. 28 U.S.C. § 2255(f)(1).[1] But Petitioners filed these challenges within one year of the Supreme Court's decision in Johnson. Consequently, Petitioners rely on § 2255(f)(3) and, under that subsection, the

---

[1] Mr. Kamahele and Mr. Maumau both filed pro se petitions within the one-year limitations period. Then, on July 6, 2016, they filed amended petitions raising for the first time the Johnson-based challenges to their 924(c) convictions. Though a district court "may, in its discretion, permit an amendment which clarifies or amplifies a claim or theory in a timely filed § 2255 petition," an amendment that "seek[s] to add a new claim or to insert a new theory into the case," does not relate back to the original filing and must itself be timely. United States v. Espinoza-Saenz, 235 F.3d 501, 504–05 (10th Cir. 2000) (citation and internal quotation marks omitted). Holding otherwise "would be tantamount to judicial rescission" of the applicable statute of limitations. Id. at 505. Petitioners challenges to their 924(c) convictions are "totally separate and distinct" from those raised in their original petitions. Id. As a result, Mr. Kamahele's and Mr. Maumau's Johnson-based challenges to their 924(c) convictions do not relate back to their original petitions.

pertinent issue for timeliness is whether <u>Johnson</u> established the right that Petitioners now assert.

Petitioners argue that <u>Johnson</u> invalidates 924(c)'s risk-of-force clause and they direct the court to <u>Golicov v. Lynch</u>, a recent decision from the United States Court of Appeals for the Tenth Circuit for support. 837 F.3d 1065 (10th Cir. 2016). In <u>Golicov</u>, the Tenth Circuit held that <u>Johnson</u> applies to the risk-of-force clause in 18 U.S.C. § 16(b), making it unconstitutionally vague. <u>Id.</u> at 1072. And the Tenth Circuit has also recognized that § 16(b) "is identical to" the risk-of-force clause in 924(c)(3)(B). <u>United States v. Autobee</u>, No. 17-1082, 2017 WL 2871893, at *3 (10th Cir. July 6, 2017). As a result, "it is reasonable to argue that [the Tenth Circuit] would similarly extend the reasoning of <u>Johnson</u> to invalidate the risk of force clause in § 924(c)(3)(B)." <u>Id.</u>

But in determining whether Petitioners' <u>Johnson</u>-based challenges to their 924(c) convictions qualify as timely, the question is whether the Supreme Court itself has recognized the right at issue, not the Tenth Circuit. <u>See</u> 28 U.S.C. § 2255(f)(3) (measuring the one-year filing deadline from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court . . ."); <u>E.J.R.E. v. United States</u>,

453 F.3d 1094, 1098 (8th Cir. 2006) (stating that "a decision taken from a federal court of appeals does not provide an independent basis to trigger the one year statute of limitations provided under [§ 2255(f)(3)]"); Ellis v. United States, No. 2:16-CV-484, 2017 WL 2345562, at *2 (D. Utah May 30, 2017) ("[A] right recognized by the Tenth Circuit is not sufficient under the terms of" § 2255(f)(3) to restart the one-year period.) For that reason, Golicov does not control here.

The question is whether Petitioners assert the same right announced in Johnson, or whether they instead assert a new right that the Supreme Court has yet to recognize. A right qualifies as "new" if it "is not dictated by precedent." Chaidez v. United States, 568 U.S. 342, 347 (2013) (citation and internal quotation marks omitted). A right is "dictated by precedent" only if "it is apparent to all reasonable jurists." Id. (citation and internal quotation marks omitted). So the inquiry is whether Johnson dictates or compels invalidation of 924(c)'s risk-of-force clause.

After thoroughly reviewing Johnson, subsequent § 924(c) caselaw, and the parties' briefing, the court concludes that Johnson does not dictate invalidation of the risk-of-force clause. Johnson limits itself to the ACCA. And it is far from "apparent to all reasonable jurists" that Johnson invalidates § 924(c)'s risk-of-

force clause as unconstitutionally vague. In fact, several courts of appeal have held the opposite—that Johnson does not invalidate § 924(c)'s risk-of-force clause. See United States v. Prickett, 839 F.3d 697, 699–700 (8th Cir. 2016); United States v. Hill, 832 F.3d 135, 145–50 (2d Cir. 2016); United States v. Taylor, 814 F.3d 340, 375–79 (6th Cir. 2016). As a result, Johnson does not dictate the right Petitioners assert. And because Johnson does not dictate the right Petitioners assert, they cannot avail themselves of § 2255(f)(3), making their Johnson-based challenges time-barred.

A recent unpublished case from the Tenth Circuit supports this conclusion. In United States v. Autobee, a petitioner challenged his § 924(c) conviction almost ten years after his conviction became final, but within one year of the Supreme Court's decision in Johnson. 2017 WL 2871893, at *3. The petitioner argued that his underlying crime of armed bank robbery no longer qualified as a "crime of violence" after Johnson and, consequently, his conviction should be vacated. Id. at *1. The district court denied the petitioner's motion. It ruled that the motion was "untimely because he filed it more than one year after the judgment of conviction became final and Johnson did not establish the right [he] . . . assert[ed]." Id. at *2. The petitioner sought a certificate of appeal from the

Tenth Circuit, contending that <u>Johnson</u> created the right he asserted because "there is no meaningful distinction between the ACCA's residual clause and the risk of force clause in § 924(c)(3)(B)." <u>Id.</u> at *3.

The Tenth Circuit denied the request for a certificate of appeal. It held that, "[e]ven if [it] were to conclude that the reasoning of <u>Johnson</u> should be extended to invalidate § 924(c)(3)(B)—which is not itself obvious even after holding that § 16(b) is unconstitutional—it is far from 'apparent to all reasonable jurists' that § 924(c)(3)(B) is unconstitutional under <u>Johnson</u>." <u>Id.</u> at *4 (quoting <u>Chaidez</u>, 568 U.S. at 347). Consequently, it held that "<u>Johnson</u> does not dictate the right [the petitioner] asserts, as he seeks an altogether new right the Supreme Court has yet to recognize." <u>Id.</u>

The court agrees with the well-reasoned analysis in <u>Autobee</u>. Consequently, the court concludes that the Supreme Court has yet to recognize the right Petitioners assert.

## ACTUAL-INNOCENCE CLAIMS

Petitioners argue that they are "actually innocent" of their VICAR and § 924(c) convictions because, regardless of <u>Johnson</u>, their underlying crimes do not qualify as crimes of violence. Petitioners note that a procedurally defaulted

and untimely claim can be pursued based on a showing of action innocence. The Government responds that Petitioners' claims do not qualify as actual-innocence claims. As a result, the Government contends that these claims are untimely and procedurally barred.

28 U.S.C. § 2255 allows a petitioner to claim "the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." Because a § 2255 claim is not intended as a substitute for an appeal, "failure to raise an issue either at trial or on direct appeal imposes a procedural bar" to raising that issue through a § 2255 claim. United States v. Barajas-Diaz, 313 F.3d 1242, 1245 (10th Cir. 2002). Additionally, as discussed above, a petitioner typically must file his § 2255 motion within one year from "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). However, as a result of § 2255's distinct "equitable nature," courts ignore procedural and time bars when a petitioner's claim "falls within the narrow class of cases . . . implicating a fundamental miscarriage of justice." Schlup v. Delo, 513 U.S. 298, 314–15, 20 (citation and internal quotations omitted) (ellipsis in original).

The "fundamental miscarriage" exception is "rare" and applies only in the "extraordinary case." Id. at 320. For this reason, the Supreme Court has tied the exception to a petitioner's "actual innocence." Id. Notably, the term "'[a]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). In these rare cases "an assertion of innocence may allow a petitioner to have his accompanying constitutional claims heard despite a procedural bar." Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir. 2012) (citing Schlup, 513 U.S. at 315). Accordingly, an actual-innocence claim is a "gateway" through which a petitioner may pass to have his otherwise-barred constitutional claims heard on the merits. Schlup, 513 U.S. at 316. But again, an actual-innocence claim should "not be allowed to do service for an appeal." Bousley, 523 U.S. at 621.

To establish actual innocence, a petitioner must provide "new evidence" sufficient to convince the court that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup, 513 U.S. at 327; see also House v. Bell, 547 U.S. 518, 537–38 (2006) (stating that a petitioner must "produce new reliable evidence," specifically "evidence the trial jury did not have before it" (citation and internal quotation marks omitted));

41

McQuiggin v. Perkins, 133 S. Ct. 1924, 1933 (2013) (holding that the actual-innocence exception applies only to the "severely confined category" of cases "in which new evidence shows it is more likely than not that no reasonable juror would have convicted" the petitioner (citation and internal quotation marks omitted)).

Here, Petitioners argue that they are innocent of their VICAR and § 924(c) convictions because their underlying crimes were improperly classified as crimes of violence. Though Petitioners appealed their convictions, they did not raise these arguments on appeal, even though the statutes and the accompanying statutory definitions all predate their appeals. Nor did Petitioners bring these claims within one year from the date their convictions became final. Accordingly, Petitioners argue that they are "actually innocent" of their VICAR and 924(c) convictions, seeking to use the fundamental-miscarriage-of-justice exception to avoid their procedural and time bars.

But Petitioners' claims do not qualify as actual-innocence claims. They do not fit within the "narrow class of cases . . . implicating a fundamental miscarriage of justice." Schlup, 513 U.S. at 314–15 (citation and internal quotations omitted) (ellipsis in original). Petitioners point to no new evidence

regarding their innocence. <u>Schlup</u>, 513 U.S. at 327. Instead, Petitioners argue only that their prior crimes were misclassified for purposes of VICAR and 924(c). As such, Petitioners arguments are of "legal insufficiency," not "factual innocence," and they do not merit the actual-innocence exception. <u>Bousley</u>, 523 U.S. at 623.

Several out-of-circuit opinions support this conclusion. For example, in <u>McKay v. United States</u>, a petitioner argued that he was "actually innocent" of an ACCA career-offender enhancement because his prior conviction "should not have been classified as a 'crime of violence.'" 657 F.3d 1190, 1199 (11th Cir. 2011). The United States Court of Appeals for the Eleventh Circuit held that the Petitioner's argument qualified as a "purely <u>legal </u>argument," not an actual-innocence argument. <u>Id.</u> Other courts have also concluded that claims like Petitioners' are claims of legal insufficiency that should have been raised on direct appeal. <u>See</u> <u>e.g.</u> <u>Damon v. United States</u>, 732 F.3d 1, 2–3 (1st Cir. 2013) (holding that because the petitioner contested "only the categorization of his prior conduct as a crime of violence," he did not plead "'actual innocence' as defined in <u>Bousley</u>."); <u>United States v. Pettiford</u>, 612 F.3d 270, 283–84 (4th Cir. 2010)

(concluding that arguments about the "legal classification of . . . predicate crimes" do not qualify as actual-innocence claims).

That claims based on legal insufficiencies do not qualify for the actual-innocence exception makes sense. The actual-innocence exception stems from the Supreme Court's effort to strike a balance between the petitioner's interest "in obtaining his release from custody if he is innocent" and the countervailing interest in the finality of judgments. Schlup, 513 U.S. at 321. If defendants, like petitioners, believe that the government failed to prove all the elements of a crime for which they were convicted, they can seek relief on appeal. Allowing a defendant to forego a direct appeal, only to bring an actual-innocence claim years later would destroy the equilibrium the Supreme Court sought to establish: it would encourage delay and call into question the finality of judgments.

Petitioner's actual-innocence claims also fail because, instead of using actual innocence as a gateway to litigate otherwise-barred claims, petitioners assert actual innocence as their substantive grounds for relief. It is true, as Petitioners point out, that the Supreme Court has not definitively resolved the question of whether a "prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." McQuiggin v. Perkins, 133 S. Ct. 1924,

1931 (2013). But the Court has never recognized that such a right exists. Rather, it has stated that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." <u>Herrera v. Collins</u>, 506 U.S. 390, 404 (1993). And the Tenth Circuit has followed the Supreme Court's "strong[] suggest[ion]" that an actual-innocence claim is not, "by itself, an adequate basis for habeas relief." <u>Stafford v. Saffle</u>, 34 F.3d 1557, 1561 (10th Cir. 1994). The Tenth Circuit has held that "an assertion of actual innocence, although operating as a potential pathway for reaching otherwise defaulted constitutional claims, does not, standing alone, support the granting of the writ of habeas corpus." <u>LaFevers v. Gibson</u>, 238 F.3d 1263, 1265 n.4 (10th Cir. 2001); <u>see</u> <u>also</u> <u>Sellers v. Ward</u>, 135 F.3d 1333, 1339 (10th Cir. 1998) (a "claim of innocence is merely the means by which an otherwise barred constitutional error affecting the fairness of the petitioner's trial can be heard"). The court follows this precedent here, as it must.

Petitioners resist the court's conclusion and point to several cases that they believe establish that actual-innocence claims do not require new evidence and can stand alone. <u>See</u> <u>e.g.</u> <u>Bousley v. United States</u>, 523 U.S. 614 (1998); <u>Phillips</u>

v. United States, 734 F.3d 573 (6th Cir. 2013); United States v. Adams, 814 F.3d 178 (4th Cir. 2016).  But in all of these cases, the parties argued that changes occurred in the relevant underlying law after the petitioners appealed.  Petitioners do not argue that the underlying law has changed here.  Consequently, these cases do not help them.

## CONCLUSION

For the reasons discussed above, the court DENIES Petitioners' motions to vacate or amend the judgements.

DATED this 9th day of August, 2017.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge

46